## COMMERCIAL CABLE COMPANY
### v.
### The UNITED STATES.
### No. 213-69.

United States Court of Claims.
June 14, 1968.

Porter R. Chandler, New York City, attorney of record for plaintiff. Davis, Polk & Wardwell, Robert F. Dobbin, and Peter H. Madden, New York City, of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a). The commissioner has done so in an opinion and report filed on April 5, 1968. On May 6, 1968, plaintiff filed a statement pursuant to Rule 62(a) electing to submit the case on the commissioner's report without exceptions and brief. On May 15, 1968, defendant filed a statement under Rule 62(b) electing to submit the case on the commissioner's report without exceptions and brief and moving that the report be adopted by the court and the petition dismissed. Since the court agrees with the commissioner's findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby grants defendant's motion to adopt, and adopts the same as the basis for its judgment in this case, without oral argument. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER *

WHITE, Commissioner:

The plaintiff, a New York corporation, is suing for $804,000 on the basis of an alleged breach by the defendant of a contract (No. AF 33(600)–26137) which the plaintiff and the defendant (represented by a contracting officer of the United States Air Force) entered into on January 19, 1954.

It is my opinion that the plaintiff is not entitled to recover.

### Introductory Statement

Under contract No. AF 33(600)–26137, the plaintiff agreed to construct at its own expense a transatlantic cable between New York, New York, and London, England, via Newfoundland, Greenland, and Iceland; the cable was to be capable of providing a minimum of 48 duplex teletypewriter channels, or, in the alternative, a minimum of 24 duplex teletypewriter channels plus at least one voice channel; the plaintiff was to complete the construction of the cable within a period of 4 years after the date of the approval of the contract by the Secretary of the Air Force; the plaintiff agreed to lease to the defendant, and the defendant agreed to lease from the plaintiff, 13 duplex teletypewriter channels for a period of 10 years following the completion of the cable; the defendant was to have the option, upon reasonable written notice, to obtain by lease any additional channels that might be available and unused; the channels leased by the defendant were to be for the exclusive use of the United States Air Force, or any other agency or department of the defendant designated by the Air Force; the defendant agreed to pay the plaintiff for the leased channels at the rate of $16,666.67 per channel per month; and all channels in the cable not leased to the defendant were to be available for commercial use by the plaintiff and its customers. (For the sake of convenience, the contract described in this paragraph will usually be referred to

hereafter in the opinion as "the contract.")

The contract was approved by the Secretary of the Air Force on January 11, 1955.

The plaintiff prepared plans for the laying of a transatlantic cable that would have a capacity of 120 duplex teletypewriter (or 5 voice) channels. The planned cable, therefore, was to have a capacity greatly in excess of the minimum capacity specified in the contract. As previously stated, all channels not leased to the defendant were to be available for commercial use.

As indicated in the findings of fact, the plaintiff made diligent efforts, and expended a large sum of money, in connection with preparatory work looking toward the construction of the cable that was called for by the contract. However, the plaintiff was not able to construct the cable. Consequently, the plaintiff never made any channels available for the use of the United States Air Force (or any other department or agency of the defendant); and the plaintiff did not make any demand upon the defendant —and no claim is asserted by the plaintiff in the present litigation—for compensation at the rate of $16,666.67 per channel per month, as contemplated by the contract.

The plaintiff contends, however, that its inability to construct the transatlantic cable in accordance with the provisions of the contract was attributable to a breach by the defendant of its contractual obligation to render assistance to the plaintiff, as imposed upon the defendant by the following portion of clause 2(h) of the contract:

(h) The Government shall render assistance to the Contractor in the following:

(1) Providing foreign cable landing sites and other facilities or approvals necessary to the performance of this contract * *.

---

* Prior to the trial on which this report is based, a motion for summary judgment was filed by the defendant, and such motion was denied by the court on May 14, 1965 (170 Ct.Cl. 813).

Unfortunately for the plaintiff—which has the burden of proof in the present action—the evidence in the record does not establish the necessary causal connection between, on the one hand, the failure of the defendant to render the degree of assistance which the plaintiff says it was entitled to receive and, on the other hand, the plaintiff's inability to construct the cable provided for in the contract. On the contrary, it is reasonable to infer from the evidence in the record that the plaintiff would still have been unable to construct the cable provided for in the contract even if the defendant had provided all the assistance that the plaintiff desired from the defendant.

*Landing License in the United Kingdom*

One of the "foreign cable landing sites" essential to the construction of the cable in accordance with the terms of the contract was a landing site in the United Kingdom, since the proposed cable was to have its eastern terminus in London, England. Accordingly, it was necessary for the plaintiff to obtain from the government of the United Kingdom a license to land the proposed cable in the United Kingdom.

The plaintiff, together with certain affiliated companies, had been engaged since 1926—and perhaps earlier—in the business of providing telecommunications service between the United States and Europe, including the United Kingdom, by both cable and radio. For service to the United Kingdom originating within the United States, the plaintiff and its related companies were in competition with other American companies, such as RCA Communications, Inc., Western Union Telegraph Co., and Press Wireless, Inc.

It should also be mentioned at this point that the American companies engaged in the telecommunications business between the United States and the United Kingdom were in competition with the General Post Office of the British government, and that the American companies obtained approximately 85 percent of the telecommunications traffic originating in the United Kingdom and flowing to the United States.

In the early 1950's, the existing cable system between the United States and the United Kingdom was very old and obsolete, no new cables having been laid since the 1920's.

Transatlantic telephone messages between the United States and the United Kingdom were transmitted by radio in the early 1950's. The radio facilities at the United Kingdom end were owned by the General Post Office of the British government (which, for the sake of convenience, will usually be referred to hereafter in the opinion as "the GPO"), and at the United States end they were owned by the American Telephone & Telegraph Company ("AT&T"). Tolls on such messages were split 50–50 between AT&T and the GPO.

Negotiations between the GPO and AT&T relative to the laying of a transatlantic telephone submarine cable ("TAT–1") connecting the United States, Canada, and the United Kingdom were begun in 1951 or 1952. During the early phase of the negotiations, the GPO wanted a 50 percent interest in TAT–1. However, after the Canadian government expressed an interest in the telephone cable, the GPO reduced its demand to an interest of 41 per cent, which it subsequently acquired in TAT–1. The negotiations ultimately resulted in the construction of TAT–1, which is owned to the extent of 50 percent by AT&T, to the extent of 41 percent by the GPO, and to the extent of 9 percent by the Canadian government.

In early June of 1954, after the contract with which we are concerned was entered into, the plaintiff requested the State Department to render assistance to the plaintiff in obtaining the landing rights—including a landing right in the United Kingdom—and the other governmental authorizations that were necessary in order that the plaintiff could construct the transatlantic cable and discharge its obligations under the contract. Accordingly, several conferences were ar-

ranged and held in Washington, D.C., during the latter part of June 1954.

In the morning of June 25, 1954, there was held at the State Department a meeting that was attended by representatives of that Department, of the United States Air Force ("USAF"), and of the plaintiff. At that meeting, the USAF advised the State Department that the USAF had a compelling need for the facilities that were provided for in the contract; and that in order to obtain those facilities, it was important to the USAF that every means available to the defendant be used to obtain the necessary governmental approvals and authorizations as promptly as possible.

Later in the day of June 25, 1954, a second conference was held at the State Department, attended by representatives of that department, of the USAF, and of the plaintiff. A rumor had reached the State Department through a competitor of the plaintiff to the effect that an official of the GPO had stated that the plaintiff would not be granted a landing license in the United Kingdom. In view of this rumor, it was decided by the conferees that every effort should be made to obtain all possible support at the highest levels of the defendant preparatory to approaching the government of the United Kingdom.

On June 30, 1954, a conference was held in the office of Deputy Under Secretary of State Robert Murphy. This conference was attended by Mr. Murphy, other representatives of the State Department, and representatives of the plaintiff. Mr. Murphy recognized the national interest involved in the completion of the proposed cable project (which had been given the code name of "Deep Freeze"), and he proposed that negotiations with the government of the United Kingdom to procure a landing license be commenced by means of a letter from the Secretary of State to the United States Ambassador in the United Kingdom, and that the initial presentation be made by the United States Ambassador to the highest British Foreign Office level. Mr. Murphy also stated that the State Department would do everything in its power to assist the plaintiff in bringing its negotiations with the United Kingdom (and other foreign governments from which landing rights were needed) to a satisfactory conclusion; and he offered to make a State Department representative available to assist the plaintiff in those negotiations.

The Deep Freeze cable project was discussed on August 6, 1954, at a meeting of the interdepartmental Telecommunications Planning Committee, composed of representatives of the Department of State, Department of Defense, Office of Defense Mobilization, and the Federal Communications Commission ("FCC"). A motion was unanimously adopted to the effect that it was "the sense of the Telecommunications Planning Committee that the State Department request its embassy in London to arrange for Admiral Stone [the plaintiff's president] to discuss * * * with government of the United Kingdom, the conditions under which the United Kingdom might grant a landing license; further the State Department be authorized to inform Admiral Stone of the position of the Executive Branch that it is most desirable to have the facility fully owned by United States citizens."

On September 2, 1954, the Department of State informed the American Embassy in the United Kingdom of the general nature of the proposed Deep Freeze cable project, and that it was a necessary military requirement of the United States. The embassy was informed that representatives of the plaintiff would soon proceed to the United Kingdom for the purpose of discussing the question of a landing license. The embassy was "requested to lend every possible assistance to the representatives of the Company [plaintiff], stressing particularly the defense factors involved."

In early September of 1954, Admiral Ellery W. Stone, the plaintiff's president, and John Hartman, another representative of the plaintiff, traveled to London for the purpose of commencing negotiations with the British government in

an attempt to obtain a landing license in the United Kingdom. The plaintiff's representatives were accompanied by T. H. E. Nesbitt, of the State Department, who had an extensive background of experience in the field of communications and who had been detailed by the State Department to assist in the negotiations because of the importance which the defendant attached to the Deep Freeze project and because of the complicated telecommunications factors involved in it. On September 9, 1954, Admiral Stone and Mr. Hartman, assisted by Mr. Nesbitt and personnel of the American Embassy in London, began negotiations with the British government, represented by the GPO, with a view toward procuring a license to land the proposed Deep Freeze cable in the United Kingdom.

In the early stage of the negotiations, the GPO noted that the proposed cable would contain sufficient telegraph capacity to equal the entire Atlantic cable facilities then in existence, and the GPO indicated that it would have to look carefully at the effect of a sudden opening of such vast new capacity in the Atlantic telegraph service. The negotiations continued until about the middle of September. The plaintiff's representatives were given to understand that the GPO had taken the proposal concerning the Deep Freeze cable project under advisement, and that in due course a reply would be received by the plaintiff from the GPO. In this connection, the GPO informed the plaintiff that it would take some time for a determination to be made. The plaintiff's representatives left London in the middle of September 1954.

In order to overcome the objections of the GPO, the plaintiff sought, through the State Department, to have the military authorities of the defendant make representations to the British military authorities respecting the vital military need for the proposed Deep Freeze cable. Pursuant to the plaintiff's request, the defendant's Joint Chiefs of Staff submitted to the British Chiefs of Staff a memorandum dated October 15, 1954, stating (among other things) that the Joint Chiefs of Staff supported the establishment of the proposed cable, that they had concluded "that there are important strategic needs for this cable," that they viewed the proposed cable "as having a definite potential strategic value and a requirement for national defense and NATO," and that the Department of Defense concurred in the importance of the cable. The memorandum concluded by stating that the Joint Chiefs of Staff "would be most grateful if the British Chiefs of Staff could support their views on the North Atlantic cable proposal and convey these views to the Government of the United Kingdom."

On March 10, 1955, the government of the United Kingdom informed the Department of State that although the former had "no desire to stand in the way of the provision of a new cable if it is essential to defence," the government of the United Kingdom could not "see their way to permitting the projected cable to be used for purposes other than defence." The State Department promptly informed the plaintiff concerning this note from the government of the United Kingdom.

On March 18, 1955, the Department of State replied to the British note of March 10 and stated (among other things) that "the Government of the United States reaffirms the urgent necessity of its defense requirements"; that "The United States Government appreciates the difficulties occasioned by certain commercial aspects of the proposed cable system and suggests that they might properly form the subject of further negotiations" between the British government and the plaintiff; and that the United States Government "urges the continuation of such negotiations and earnestly requests that the British Government give appropriate consideration to the views and requirements of the United States Government as set forth in this note."

In early April of 1955, the GPO informed personnel of the American Em-

bassy in London that American companies had long held a predominant position in the telegraph business between the United States and the United Kingdom, and the GPO "had for some time aspired for a larger share of it," and that the GPO "visualized increased * * * participation in two forms: (a) part ownership of the 'Deep Freeze' undertaking * * * and/or (b) utilization of certain 'excess capacity' in the 'TAT' cable for telegraphic purposes * * *." It was indicated that if the desire of the GPO partially to utilize TAT–1 for telegraph traffic to and from the United States were to materialize, the granting of a landing license to the plaintiff would be greatly facilitated. Information concerning the position of the GPO was transmitted by the American Embassy in London to the Department of State.

On June 8, 1955, the government of the United Kingdom reaffirmed the position which it had taken on March 10, 1955 to the effect that the British government was still unable to agree to the use of the proposed Deep Freeze cable for commercial purposes, although it had no desire to stand in the way of the construction of a new cable for defense purposes alone.

At a conference between Admiral Stone and an official of the GPO that was held in London on June 15, 1955, Admiral Stone was advised that the GPO was prepared to consider alternative proposals, possibly involving partial ownership of the proposed Deep Freeze cable by the GPO. It was the position of the GPO that a commercial facility owned, controlled, and operated wholly by an American organization "would get nowhere."

On June 16, 1955, Admiral Stone conferred in London with the British Postmaster General. It was the latter's position that the American carriers already had a dominant position in transatlantic communications, and the proposed Deep Freeze cable would intensify such dominance; and that, because of this, the GPO could not agree to 100 percent ownership of Deep Freeze by the plaintiff.

On the other hand, the British Postmaster General expressed the opinion that in view of the heavy investment of the GPO in TAT–1, it was unlikely that Parliament would authorize a further investment in Deep Freeze. Nevertheless, the British Postmaster General indicated a willingness to consider "any alternative offer," although he was unable to see any probability of agreement. During the course of the conference, the British Postmaster General expressed confidence in ultimately being able to get telegraph service into the United States via TAT–1.

On June 23, 1955, Admiral Stone and John Hartman, representing the plaintiff, conferred with representatives of the State Department in Washington, and fully advised them of the then-current status of the negotiations with the government of the United Kingdom. The plaintiff's representatives expressed the opinion that if further negotiations with the United Kingdom were to be successful, it would be necessary to give the GPO concessions in the nature of an ownership interest in the proposed Deep Freeze cable.

Admiral Stone and John Hartman returned to London and participated in further discussions with the GPO during the period October 10–28, 1955, relative to the proposed Deep Freeze project. The purpose of plaintiff's representatives was to propose participation in the project by the GPO, in view of the objections previously made by the GPO to the construction of a cable with commercial capacity that would be wholly owned by the plaintiff.

The initial proposal submitted by the plaintiff to the GPO during the October 1955 discussions was that the GPO participate in the Deep Freeze project from the outset, either (1) by acquiring a share in the ownership of the cable as a whole (as had been done by the GPO in connection with TAT–1), or (2) by undertaking to provide a section of the cable. The GPO representatives expressed doubt concerning the financial soundness of the Deep Freeze project; and

they also took the position that even if the financial uncertainties of the project could be eliminated, participation would be unattractive to the GPO because of the nature of the route.

The representatives of the plaintiff next submitted an alternative proposal to the GPO, under which the plaintiff would proceed with the Deep Freeze project without participation by the GPO initially, and the GPO would have an option to purchase a share in the project at the end of a period that was to be agreed upon and of sufficient length to permit the technical and financial soundness of the new cable to be established. The representatives of the GPO indicated that they did not find the plaintiff's alternative proposal to be satisfactory, since the objections that led the GPO to reject the plaintiff's 1954 proposal, under which the new cable would be wholly owned by the plaintiff, applied with equal force to the alternative proposal outlined in this paragraph, since the proposed cable would be wholly owned by the plaintiff unless and until the GPO exercised its option. In the meantime, the transatlantic cable capacity in American ownership would be substantially increased.

At the conclusion of the October 1955 discussions, the representatives of the GPO agreed that the plaintiff's alternative proposals would be submitted to the British Postmaster General, who, in turn, would probably make a recommendation to the British cabinet.

Upon returning to the United States after the conclusion of the October 1955 negotiations, Admiral Stone informed representatives of the State Department and all other interested agencies of the defendant regarding the nature and outcome of the discussions in London.

In a letter dated February 21, 1956, the plaintiff was informed by the GPO that the latter had come to the conclusion "that it would not be possible to consider the 'Deep Freeze' project independently of a full review of the future arrangements for transatlantic telecommunications services," and that it was not known at that time just when such review would be completed.

The evidence in the record clearly shows—and the plaintiff does not make any contention to the contrary—that up until the beginning of May 1956, at least, the defendant rendered to the plaintiff all the assistance that the plaintiff could reasonably expect in connection with its efforts to obtain a cable landing license in the United Kingdom. However, with respect to May 1956 and thereafter, the plaintiff asserts in its brief that "beginning in May 1956 defendant abruptly stopped rendering the assistance it was required to give," with the result that the plaintiff was unable to obtain a cable landing license in the United Kingdom and, hence, was unable to perform the contract.

■ In connection with the contention referred to in the last sentence of the preceding paragraph, the plaintiff has a two-fold burden: first, it must show that in May 1956 and thereafter the defendant failed to render the assistance required by clause 2(h) (1) of the contract; and, second, the plaintiff must show that the defendant's default in this respect was responsible for the plaintiff's inability to obtain a cable landing license in the United Kingdom. The events of May 1956 and thereafter must be considered in the light of the plaintiff's burden.

It having been learned that the British Postmaster General intended to send to the United States a delegation to discuss with representatives of the defendant the possibility of "a package deal" relative to transatlantic communications between the United Kingdom and the United States, meetings were held in Washington, D.C., on May 4, 7, and 8, 1956 between representatives of the State Department, the Department of Defense, the Office of Defense Mobilization, and the FCC, for the purpose of attempting to arrive at a position to be taken by the defendant with respect to the matters that were to be discussed with the British delegation. At the meeting on May

7, there was a discussion regarding the "vital need for Deep Freeze" and the "price" that the defendant should pay in obtaining Deep Freeze; and at the meeting on May 8 it was agreed that Assistant Secretary of Defense Pike would explore the position of the Department of Defense as to the importance at that time of the Deep Freeze cable project to national security, under the assumption that arrangements for this telegraph cable could be obtained only if it were agreed that the United Kingdom could have a partial ownership interest in the cable and that this would result in serious impairment to the economic success, or possibly the continued existence, of the telegraph cable facilities already in operation across the North Atlantic.

In accordance with the arrangement made at the meeting on May 8, Assistant Secretary Pike wrote a letter on May 10, 1956 to the Director of the Office of Defense Mobilization, stating in part as follows:

> * * * I can advise you that if, in the judgment of you and others in a position to form a conclusion, the "Deep Freeze" project, through joint ownership, is definitely established as jeopardizing the other in being trans-Atlantic telegraph services, then the Department of Defense would consider such an economic outcome as outweighing the importance to national security of the proposed cable.‐ * * *

Meetings were held in Washington, D. C., on May 16, 17, 18, 22, 23, 24, and 25, 1956 between delegations representing the defendant and the United Kingdom concerning telegraph service between the United States and the United Kingdom. The delegation from the United Kingdom included representatives of the GPO and personnel from the British Embassy in Washington. The defendant's delegation included representatives of the Department of State, Department of Defense, Office of Defense Mobilization, and the FCC.

The British desire that TAT–1 should be used for telegraph service as well as for telephone service was discussed at a morning meeting on May 22, 1956. The defendant's delegation took the position that the defendant's policy was against the use of TAT–1 for telegraph service, except in case of national emergency or if the FCC should determine, in the public interest, that adequate facilities at reasonable rates were not available via telegraph carriers, in which case telegraph service should be provided by the leasing of channels in TAT–1 by existing telegraph carriers.

The matter of the proposed Deep Freeze cable was discussed at an afternoon meeting on May 22, 1956. In response to an inquiry from the British delegation as to whether an agreement between the United Kingdom and the plaintiff under which the GPO would have an ownership interest in the Deep Freeze cable would be acceptable to the defendant without the GPO obtaining similar interests in the existing transatlantic telegraph cables operated by American companies, a Commissioner of the FCC, who was a member of the defendant's delegation, said that expressed defense needs had been the motivating factor of the project, which had originally been for a cable in the sole ownership of the plaintiff; that the FCC had given approval to the project in principle so that negotiations might proceed; that subsequent to the time when the approval in principle was given, the circumstances had changed, noticeably in respect to the possibility of participation by the GPO in the project; and that the delicate balance among the American telegraph carriers in the North Atlantic might be affected in different ways, depending on the nature and extent of participation by the GPO in Deep Freeze and on the way in which the United Kingdom dealt with the other American carriers. A member of the British delegation commented that the Deep Freeze proposal had been presented to the United Kingdom with the support of the defendant, but that there was now considerable doubt as to whether a contract on that basis would be regarded favorably by agencies of the defendant.

No agreement was reached during the May 1956 meetings on the matters mentioned in the two immediately preceding paragraphs of this opinion.

In a communication dated July 2, 1956, the British Postmaster General wrote a letter to the plaintiff, stating in part as follows:

> Had this matter been one of military necessity and had the intention been to use the cable for defence purposes only, there would, as you know, be no obstacle on our part. But considering it, as we must, as a commercial project, my view is that there is no immediate or urgent need for a new facility of this kind; moreover, it seems to me that the proposed cable is an uneconomic and geographically hazardous method of providing Transatlantic telegraph circuits. In these circumstances, I have been obliged to reach the conclusion that your proposals cannot be accepted. * * *

It is the plaintiff's theory that the Defense Department breached clause 2 (h) (1) of the contract by abandoning in May 1956 the efforts "to give strong and vigorous support on the highest levels to Deep Freeze to obtain approval from the British"; and that, as a result, "The British immediately learned that Deep Freeze was no longer regarded by the United States as being an urgent military necessity, and promptly rejected plaintiff's revised proposals." However, the plaintiff has failed to prove that it was a "softening" of the position of the Defense Department on the military importance of the Deep Freeze cable project that caused the GPO finally to reject the plaintiff's request for a landing license in the United Kingdom. .

The evidence shows that the GPO was chiefly motivated by a desire to obtain an agreement whereby TAT–1, which was owned to the extent of 41 percent by the GPO, could be used for telegraph service as well as for telephone service. The defendant's delegation at the May 1956 meetings opposed this proposal by the GPO. However, the plaintiff cannot complain about the action of the defendant's delegation in this respect, because the position of the defendant's delegation regarding the use of TAT–1 for telegraph service was in conformity with a recommendation which the plaintiff had previously made to the defendant.

With respect to the Deep Freeze project, the evidence in the record warrants the inference that perhaps (there is no clear-cut showing on this point) the GPO would have been willing to approve and grant a landing license for this project if—and only if—the defendant could have been persuaded through negotiations (1) to agree to the use of TAT–1 for telegraph service, and (2) to agree to a revision of the Deep Freeze project so that the GPO might have an ownership interest in the proposed Deep Freeze cable, without the GPO being required to procure ownership interests in the existing transatlantic telegraph cables operated by American companies. Accordingly, when it became apparent to the GPO that the defendant's firm opposition to the use of TAT–1 for telegraph service ruled out the possibility of a "package deal" under which the opening of TAT–1 for telegraph service might be obtained if the GPO would approve the Deep Freeze project under a revised plan whereby the proposed cable would be jointly owned by the plaintiff and the GPO, any chance of the GPO granting a landing license for the Deep Freeze project disappeared.

Throughout the entire history of the negotiations with the GPO concerning the Deep Freeze project, the GPO indicated that a landing license would not be granted for the project as outlined in the contract—i. e., a transatlantic cable which was to be owned by an American company and which was to be used partially for commercial purposes and partially for military purposes. This firm line on the part of the GPO was taken long before the supposed "softening" of the Defense Department's position on the military importance of Deep Freeze in May 1956. Even when the plaintiff proposed to the GPO in October 1955 that

the latter participate in the Deep Freeze project by acquiring a share in the ownership of the proposed cable, the GPO did not display any real interest in the proposal. The GPO not only expressed doubt concerning the financial soundness of the Deep Freeze project, but also took the position that even if the financial uncertainties of the project could be eliminated, participation would be unattractive to the GPO because of the route. Then, when the plaintiff's request for a landing license was finally turned down by the British Postmaster General, it was on the ground that there was no immediate or urgent need for a new telegraph cable having commercial capacity, and that the proposed cable was "an uneconomic and geographically hazardous method of providing Transatlantic telegraph circuits." Thus, the GPO was opposed to Deep Freeze before, during, and after May 1956, although the GPO might possibly have been willing to approve the project as a "price" for obtaining the defendant's consent to the use of TAT–1 for telegraph service, if this could have been coupled with a revision of the Deep Freeze plan so that partial ownership of Deep Freeze could be acquired by the GPO.

Therefore, it must be concluded that the evidence fails to establish that the plaintiff's inability to obtain a cable landing license in the United Kingdom was caused by the defendant's failure, in May 1956 and thereafter, to render assistance to the plaintiff *in connection with the project outlined in the contract.* Rather, the evidence warrants the inference that even if the defendant in May 1956 and thereafter had continued to render the same sort of assistance to the plaintiff which the defendant had rendered up until May 1956, the GPO would still have refused to grant a landing license for the cable envisioned by the contract.

*Landing License in the United States*

It was also necessary for the plaintiff to obtain a license to land the Deep Freeze cable in the United States. Applications for such licenses were and are handled by the FCC.

On the basis of an informal presentation by the plaintiff, with support from the USAF, the Joint Communications Electronics Committee of the Joint Chiefs of Staff, and the interdepartmental Telecommunications Planning Committee, the FCC on August 12, 1954 "approved in principle" the proposed Deep Freeze cable, but reserved "the right upon application by the company [i. e., the plaintiff] for a United States cable landing license, to impose such terms and conditions as the Commission finds to be required in the public interest upon thorough investigation of the facts and considerations which may be brought to its attention."

Subsequently, after the Department of Defense stated in the letter dated May 10, 1956 that if it were determined that the Deep Freeze project would jeopardize economically the existing transatlantic cable services, then the Department of Defense would consider such an economic outcome as outweighing the importance to national security of the proposed Deep Freeze cable, the FCC on September 19, 1956 withdrew its approval of the Deep Freeze project in principle. In doing so, however, the FCC stated that it "was *not* prejudging this matter," and that if and when a formal application for a cable landing license in the United States was subsequently submitted by the plaintiff, the application would be considered *de novo* in the light of a complete investigation of all relevant factors.

The plaintiff contends that the "softening" of the Defense Department's attitude on the military importance of the Deep Freeze project, as reflected in the letter dated May 10, 1956, involved a breach by the Defense Department of the obligation to render assistance to the plaintiff under clause 2(h) (1) of the contract. Assuming (but not deciding) that the plaintiff is correct in this contention, the evidence in the record fails to establish that the plaintiff would have been able to construct the cable under the contract if the Defense Department had not "softened" its support of the Deep Freeze project and if the FCC had not

withdrawn its approval in principle of Deep Freeze. It should be noted in this connection that the action of the FCC on September 19, 1956 in withdrawing its approval in principle of Deep Freeze occurred after the British Postmaster General had formally rejected the plaintiff's proposal on July 2, 1956. Without a landing license in the United Kingdom, it was impossible for the plaintiff to construct the cable called for by the contract.

In the final analysis, it appears that the plaintiff's inability to construct the cable under the contract was due to the plaintiff's failure to obtain a landing license in the United Kingdom, and that, as indicated in the preceding part of this opinion, the plaintiff has failed to establish that its failure to obtain a landing license in the United Kingdom was attributable to a breach by the defendant of the latter's obligation to render assistance to the plaintiff under clause 2(h) (1) of the contract.

### Abandonment of Project

On September 26, 1956, the plaintiff was orally advised by the USAF not to incur any further expenses in connection with the Deep Freeze project until the USAF decided what it was going to do in view of the then-prevailing circumstances. This advice was further confirmed by the USAF on October 29, 1956.

In a letter dated June 13, 1958 and addressed to the USAF, the plaintiff referred to the advice which it had received from the USAF in September 1956, and subsequently, to the effect that the plaintiff should not incur any further expenses under the contract. The plaintiff mentioned the substantial period of time that had elapsed since the receipt of such advice, and stated the plaintiff's understanding that the Deep Freeze project was to be replaced by another trans-atlantic cable project that would be used only for military purposes. The plaintiff then requested "that the subject contract be terminated for the convenience of the Government pursuant to clause 7 thereof."

The reply of the USAF to the plaintiff's letter of June 13, 1958 stated in part as follows:

\* \* \* The contract obligated the Government to lease certain channels on a cable which you were to construct. Since the cable has not been completed, the Government would appear to have no obligation which can be terminated.

The present action, alleging a breach by the defendant of its obligation to render assistance to the plaintiff under clause 2(h) (1) of the contract, was subsequently filed on June 2, 1960.

### Conclusion

 For the reasons stated in the previous parts of this opinion, the plaintiff is not entitled to recover, and the petition should be dismissed.